UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSHANAK AMELI-TEHRANI,

        Plaintiff,

                                   Civil Action No. 09-CV-14126

vs.                               HON. MARK A. GOLDSMITH

L. KENT WHITEMAN,

        Defendant.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT (D.E. 44) AND GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (D.E. 59)**

Before the court are Plaintiff's motion for summary judgment and Defendant's motion

for partial summary judgment. For the reasons set out below, Plaintiff's motion is denied and

Defendant's motion is granted, in part, and denied, in part.

**I.**      **Factual and Procedural Background**

Beginning at some point in the 1990s, Ameli-Tehrani and Whiteman, an attorney, began

engaging in business deals together while romantically involved. Docket Entry (D.E.) 1 ¶ 5

(complaint). In 1999, Ameli-Tehrani gave Whiteman funds, and together they invested in a real

estate venture in Florida. Id. ¶¶ 6-8. The parties contemplated further investments together,

created a joint bank account for that purpose, and invested in other ventures. Id. ¶ 9. According

to Ameli-Tehrani, pursuant to this arrangement, Whiteman invested some amount of his own

money and over $400,000 of her money in five separate ventures. Id. The parties agree that they

ceased participating in real estate ventures together in or around 2003. Id. ¶ 11; D.E. 11 ¶ 11

(answer).  At some point after that, Ameli-Tehrani asked Whiteman to return her money.

Whiteman did not have the funds to pay Ameli-Tehrani.  Instead, in 2004 Whiteman gave Ameli-Tehrani a promissory note in the amount of $550,000, which she accepted.  D.E. 15 ¶¶ 14, 16 (counterclaim).  The note read:

<u>PROMIS[S]ORY NOTE</u>

> I Kent Whiteman promise to repay to Roshanak Ameli $550,000 at 10% interest per annum.  That if there is a default on this obligation I will sign over my share to the South University Properties LLC properties as collateral for this debt.

D.E. 44-2.  The note, signed by Whiteman, was dated August 1, 2004.  At some point in 2007 Ameli-Tehrani demanded payment on the note.  It is undisputed that Whiteman did not pay Ameli-Tehrani the $550,000 plus interest.

On November 15, 2007, the parties entered into a "Membership Purchase Agreement" related to Whiteman's share of South University Properties.  The agreement provided in part:

> THIS AGREEMENT is made and entered into this 15th day of November, 2007, by and between Kent L. Whiteman ("Seller") and Roshan[ak] Ameli[-Tehrani] ("Buyer").
>
> . . .
>
> WHEREAS, Seller desires to sell to Buyer and Buyer desires to purchase from Seller a membership interest in S. University Properties, (["LLC"]), upon the terms and conditions set forth below,
>
> . . .
>
> <u>Agreement to Sell</u>.  Seller agrees to sell an undivided Fifty (50%) percent interest in the LLC to the Buyer subject to any encumbrance on the LLC[']s property. Buyer agrees to assume and perform any obligation of the Seller with respect to the LLC[']s property and to obtain the release of the Seller from the mortgage and any guarantee within three (3) years of Closing.
>
> . . .
>
> <u>Consideration</u>.  In consideration for the sale and transfer of the interest, Buyer shall pay to Seller the purchase price of Two Hundred Thousand ($200,000)

2

Dollars . . .

D.E. 58-4 (Membership Purchase Agreement).  Importantly, the agreement also contained a

merger clause, which provided that

> "[t]his Agreement embodies the entire agreement and understanding of the
> parties hereto with respect to the subject matter hereof, and supersede[s] all prior
> and contemporaneous letters, agreements and understandings relative to said
> subject matter."

Id.  The 2004 promissory note is not mentioned in the agreement.

The parties dispute the significance of the property transfer effectuated by the November

2007 Membership Purchase Agreement.   Whiteman maintains that, pursuant to the default

provision on the promissory note, he had transferred his interest in South University Properties to

Ameli-Tehrani, thereby discharging his obligations under the note.  D.E. 58 at 2 (brief opposing

summary judgment).  Despite the agreement's failure to mention the promissory note, Whiteman

maintains that prior to the November 2007 Membership Purchase Agreement, "Ameli-Tehrani

and Whiteman negotiated and agreed that Whiteman's transfer of his 50% interest in [South

University Properties] to Ameli-Tehrani would fully satisfy, release[,] and discharge any and all

obligations and liabilities of Whiteman to Ameli-Tehrani under the Promissory Note."  D.E. 58

at 6.

Whiteman points to several pieces of evidence in support.  First, he cites an October 21,

2007 email from Ameli-Tehrani to Larry Ferguson (the attorney who drafted the Membership

Purchase Agreement) and Heinz Schmidt (Ameli-Tehrani and Whiteman's accountant).  In the

email, Ameli-Tehrani states, in part,

> I wanted to give you a breakdown of how Kent and I have decided to handle the
> buyout.  It is outlined in the attached excel spreadsheet.  Essentially, Kent will be
> receiving $200,000 in cash from me for his 50% in SUP LLC.[1]  This is based on

---

[1]The parties frequently refer to South University Properties as "SUP".

<u>amounts that he owes me</u> and the treatment of his initial investment as essentially a mortgage.

D.E. 58-3 at 2 (emphasis added).  The attached spreadsheet, created by Ameli-Tehrani, shows calculations for the then-current amount that Whiteman owed Ameli-Tehrani under the promissory note, along with calculations for the money value of Whiteman's share in South University Properties, and subtracts the amount Whiteman owed Ameli-Tehrani from the amount South University Properties "owed" Whiteman, showing a final amount of $200,000 "net to KW."[2]  D.E. 58-3 at 4.  In addition, a subsequent email by Ameli-Tehrani to Ferguson the next day stated, "I would like the buyout to take place right away <u>as kent is paying his debt to me back through the buyout</u>."  D.E. 58-3 at 9 (emphasis added).

Whiteman also cites other pieces of evidence.  Ferguson, the attorney who was jointly retained by Whiteman and Ameli-Tehrani to draft the Membership Purchase Agreement and had represented both parties in the past, submitted a sworn affidavit stating that Ameli-Tehrani and Whiteman requested that he draft the agreement to "assign Whiteman's 50% interest in SUP to Ameli-Tehrani in exchange for payment to Whiteman of $200,000 and a discharge of the Promissory Note. . . ."  D.E. 58-6 ¶ 5 (Ferguson affidavit).  In addition, Schmidt, who prepared individual tax returns for both Whiteman and Ameli-Tehrani along with the tax return for South University Properties, submitted a sworn affidavit stating that it was clear to him from Ameli-Tehrani's October 2007 email as well as "other emails and other communications" that he had had with Ameli-Tehrani and Whiteman, that "the purpose of the SUP Transaction was to settle any financial and other obligations existing between the two of them, including the promissory note and any other debts Whiteman owed to Ameli-Tehrani."  D.E. 58-7 ¶ 7 (Schmidt affidavit).

---

[2]In the document the parties are represented by their initials or first names.  Roshanak Ameli-Tehrani is "R," or "RAT."  Kent Whiteman is "KW" or Kent.  D.E. 58-3 at 4.

Finally, in an April 29, 2009 email sent by Ameli-Tehrani to Whiteman, Ameli-Tehrani expresses regret about making calculations in the South University Properties sale in a manner benefitting Whiteman and asks him for financial help.  D.E. 58-9 at 2-4.  In the email, Ameli-Tehrani recounts the spreadsheet calculations and how she made several adjustments in Whiteman's favor, indicating multiple times that the promissory note amount that Whiteman owed her was calculated into the original transaction.  See e.g., D.E. 58-9 at 2-3 ("I also lowered the amount you owed me from $550,000 to $450,000 as well as lowering the rate of interest on my loan to you from 12% to 6%.").[3]  Whiteman also argues that if Ameli-Tehrani truly believed that the promissory note was still in effect, she could have simply demanded repayment on the note at that point instead of asking for Whiteman to undo the S. University Properties transaction.

Ameli-Tehrani vigorously disputes Whiteman's contention that the property transfer discharged Whiteman's obligation to her under the promissory note.  She maintains that the evidence Whiteman cites is "immaterial," given the plain language of the Membership Purchase Agreement, which contains a merger clause and does not mention the promissory note.  See D.E. 62 at 1 n.1 (Plaintiff's reply brief).  She also states that the language of the signed agreement "reflected [her] understanding of the transaction."  Id.

Notwithstanding her position that the evidence Whiteman cites does not matter, Ameli-Tehrani does address the spreadsheet.  According to Ameli-Tehrani, the spreadsheet she created and sent to Ferguson and Schmidt did not set out the parties' intentions for the Membership Purchase Agreement.  Instead, Ameli-Tehrani maintains that the spreadsheet came about because

---

[3]For the sake of clarity, the Court notes that Ameli-Tehrani's recollection was not quite correct. She lowered the amount Whiteman owed her to $500,000, and lowered the rate of interest to 6% from an original rate of 10%.  See D.E. 58-3 at 4.

of the following circumstances.  Whiteman approached her in 2007 and asked her to buy him out of South University Properties for $200,000 because he needed money and needed to demonstrate to his new wife that he was no longer doing business with Ameli-Tehrani.  D.E. 62 at 1 n.1.  However, "after it became clear from the appraisals that [the South University Property] was not worth what the Defendant had hoped and told Plaintiff it was, Defendant asked Plaintiff to create and send to Larry Ferguson and Heinz Schmidt . . . a spread sheet showing various 'what if' scenarios under which they maintained the $200,000 purchase price but allowed Defendant to obtain 'favorable business/tax treatment.'"  D.E. 62 at 1 n.1.  According to Ameli-Tehrani, the spreadsheet she created was in response to this request by Whiteman.  Ameli-Tehrani states that she "[knew] the spreadsheet scenarios did not correspond with reality"; that is why she asked Whiteman "if her rights under the note would be prejudiced."  D.E. 62 at 1 n.1.[4] He assured her that they would not be.  Id.  Ameli-Tehrani states that "months later"[5] the Membership Purchase Agreement was signed, and she "thought nothing more of the earlier spreadsheet."  D.E. 62 at 1 n.1.

---

[4]In support of this fact, Ameli-Tehrani points to an October 27, 2007 email she wrote to Whiteman six days after she sent the spreadsheet email.  In her email to Whiteman, she states in part,

> I thought the whole reason we are doing all these calculations was because you want to be able to use[] your tax losses against supposed gains for [Schmidt] and to show Elisabeta that you have settled all 'dealings' between us.  Why then are you telling me not to email [Schmidt]?  And what are [the] tax conseque[n]ces for me?  I'm so stressed about this, with [the] huge payment that I am now saddled with because of the new mortgage.  When do you think you can pay me back?

D.E. 62-7 at 2 (emphasis added).

[5]Although the Membership Purchase Agreement is dated November 15, 2007, less than a month after Ameli-Tehrani emailed the spreadsheet to the lawyer and accountant, a March 5, 2008 email from Ameli-Tehrani to Ferguson indicates that at least her signature was likely not secured until around that time.  See D.E. 62-8 at 2 (stating that she "just" faxed her copies of the signed document and that she "guess[es] the Nov 15 2007 dating of documents is ok with [Schmidt].")

Accordingly, Ameli-Tehrani contends that Whiteman's obligation on the promissory note has not been discharged.

On October 20, 2009, Ameli-Tehrani filed suit in this Court against Whiteman raising claims of (i) breach of contract for failing to pay the promissory note, (ii) breach of fiduciary duty, and (iii) unjust enrichment.  D.E. 1.  Whiteman filed a counterclaim seeking a declaratory judgment that the property transfer under the Membership Purchase Agreement discharged his obligations under the note.   In the alternative, the counterclaim seeks reformation of the agreement based upon (i) mutual mistake, (ii) mistake and/or fraud, or (iii) fraudulent and/or innocent misrepresentation.  D.E. 15.  The parties engaged in discovery.  On September 24, 2010, Ameli-Tehrani filed a motion for summary judgment.  D.E. 44.  On October 15, 2010, Whiteman filed a motion for partial summary judgment.  D.E. 59.  The motions were fully briefed, and on December 9, 2010, this Court held a hearing on the motions.

## II.     Discussion

Summary judgment should be granted only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  As the Sixth Circuit has explained,

> [t]he burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by "showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotation marks omitted). In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.  Rather, the evidence should be viewed in the light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Thus, the facts and any inferences that can be drawn from those facts[ ] must be viewed in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 373 (6th Cir. 2009) (quotation marks omitted).

7

### A.      Ameli-Tehrani's Motion for Summary Judgment

Ameli-Tehrani argues that she is entitled to summary judgment on Count I of her complaint (alleging that Whiteman breached the promissory note).[6]   The amount of the promissory note and Ameli-Tehrani's demand for payment of the note are not in dispute.   The only question is whether the subsequent property transfer discharges Whiteman's debt to Ameli-Tehrani.

Because the Membership Purchase Agreement (i) does not mention the promissory note and (ii) contains a merger clause stating that the agreement itself embodies the entire understanding of the parties, Ameli-Tehrani contends that Whiteman may not present extrinsic or parol evidence showing that the Membership Purchase Agreement was supposed to discharge the promissory note.   According to Ameli-Tehrani, under Michigan law, if the parties have included an express merger clause in their agreement, it is conclusive and extrinsic evidence is not admissible unless (i) fraud invalidates the merger clause, (ii) the agreement is incomplete on its face, or (iii) a term within the agreement is ambiguous.   D.E. 44 at 6.   Ameli-Tehrani argues that, because none of the exceptions applies here, Whiteman's extrinsic evidence cannot be considered to show that the contract is not integrated or to otherwise attempt to contradict, vary, or explain its terms.   Id. at 6-7.

Whiteman offers several responses.   First, he argues that there is an ambiguity in the written agreement.   D.E. 58 at 13.   Second, he argues that Michigan law permits extrinsic evidence where the "actual consideration" exchanged by the parties differs from what is expressed in the agreement.   Id. at 14-15.   Third, Whiteman argues that extrinsic evidence is admissible to demonstrate that the agreement should be reformed because of mutual mistake,

---

[6] Ameli-Tehrani titled the motion a "Motion for Summary Judgment."  D.E. 44.  However because Ameli-Tehrani only moves for summary judgment on Count I of her complaint, see id. at 3, the motion is actually a partial motion for summary judgment.

unilateral mistake/fraud, or scrivener's error.  See id. at 15-19.  Whiteman asks the Court "to modify the Membership Purchase Agreement in accordance with the intent, understandings[,] and agreements between the parties that the Membership Purchase Agreement released, discharged, and/or canceled any and all obligations that Whiteman may have owed Ameli-Tehrani under the Promissory Note." Id. at 15.

### 1. Ambiguity

Whether a contract is ambiguous is a question of law determined by the court.  Coates v. Bastian Brothers, Inc., 741 N.W.2d 539, 543 (Mich. Ct. App. 2007).  When construing a merger clause, a court "must look for the intent of the parties in the words used in the instrument"; a court "does not have the right to . . . look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." UAW-GM Human Res. Ctr. v. KSL Recreation Corp., 579 N.W.2d 411, 414 (Mich. Ct. App. 1998) (quoting Michigan Chandelier Co. v. Morse, 297 N.W. 64, 67 (Mich. 1941)).  If the contract language is clear and unambiguous, a court must interpret and enforce the contract as written.  Frankenmuth Mut. Ins. Co. v. Masters, 595 N.W.2d 832, 837 (Mich. 1999).  In contrast, a contract is ambiguous when two provisions "irreconcilably conflict with each other" or when a term is equally susceptible to more than one meaning.  Coates, 741 N.W.2d at 543.  If the contract language is ambiguous, its meaning is a question of fact to be decided by the jury.  Klapp v. United Ins. Group Agency, Inc., 663 N.W.2d 447, 453-54 (Mich. 2003).  To resolve an ambiguous contract, the jury may consider relevant extrinsic evidence.  Id. at 454.

Whiteman argues that  the Membership Purchase Agreement is ambiguous by virtue of the phrase "with respect to the subject matter hereof" in the merger clause.  The entire merger clause states:

> "[t]his Agreement embodies the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and supersede[s] all prior and contemporaneous letters, agreements and understandings relative to said subject matter."

D.E. 58-4 (emphasis added). The Court understands Whiteman's argument to be as follows. While a reasonable interpretation of the "subject matter hereof" phrase is that it refers to the subject matter expressly addressed in the Membership Purchase Agreement, another plausible interpretation of the phrase is that the "subject matter" of the Membership Purchase Agreement "include[s] the components of the . . . calculations" that Ameli-Tehrani made on the spreadsheet in order to arrive at the $200,000 amount. D.E. 58 at 13. The evidence Whiteman offers in support of this alternate interpretation is the fact that Ferguson "testified that he drafted the Membership Purchase Agreement to cancel Whiteman's obligations under the Promissory Note." Id. Thus, Whiteman argues, there are two reasonable interpretations of the phrase, making it ambiguous.

The Court rejects Whiteman's argument because the phrase "subject matter hereof" is not equally susceptible to more than one meaning. The natural reading of the term is that it refers to the subject matter expressly addressed in the Membership Purchase Agreement. Ferguson's subjective and extra-textual understanding that the Membership Purchase Agreement was supposed to address Whiteman's debt to Ameli-Tehrani does not change the natural reading of the phrase. See UAW-GM, 579 N.W.2d at 414.

Accordingly, the contract is not ambiguous.[7]

---

[7] The Court also rejects Whiteman's argument that extrinsic evidence is permissible where the "actual consideration" exchanged by the parties is different than that expressed in the agreement. The cases that Whiteman cites in support of this argument are all limited to a specific situation – the recital of consideration in a deed. See, e.g., In re Rudell Estate, 780 N.W.2d 884, 895 (Mich. Ct. App. 2009). This authority, addressing how conveyance instruments should be interpreted, is readily distinguishable from the circumstances of the instant case involving contract

## 2. Parol Evidence and Reformation

Except where equitable considerations may counsel otherwise, see discussion infra at 12-14, Ameli-Tehrani is correct that Whiteman cannot present extrinsic or parol evidence to show that the contract is not integrated or to otherwise attempt to contradict, vary, or explain its terms. With regard to parol evidence, the general rule states:

> When two parties have made a contract and have expressed it in writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.

NAG Enterprises, Inc. v. All State Indus., Inc., 285 N.W.2d 770, 771 (Mich. 1979) (citing 3 Corbin on Contracts, § 573). In the absence of a valid merger clause, it is a prerequisite to application of the parol evidence rule that there be a finding that the parties intended the written instrument to be a complete expression of their agreement with regard to the matters covered; thus, "[e]xtrinsic evidence of prior or contemporaneous agreements or negotiations is admissible as it bears on this threshold question of whether the written instrument is such an 'integrated' agreement." Id. However, where a contract includes a merger or integration clause, parol evidence is not needed to resolve the threshold question, and thus is not permissible. As the Michigan Court of Appeals has explained,

> if parol evidence were admissible with regard to the threshold issue whether the written agreement was integrated despite the existence of an integration clause, there would be little distinction between contracts that include an integration clause and those that do not. When the parties choose to include an integration clause, they clearly indicate that the written agreement is integrated; accordingly, there is no longer any "threshold issue" whether the agreement is integrated and, correspondingly, no need to resort to parol evidence to resolve this issue. Thus NAG, which allows resort to parol evidence to resolve this "threshold issue," does not control when a contract includes a valid merger clause.

---

interpretation. Importing this authority into the law of contract interpretation would entirely eviscerate the effectiveness and utility of a merger clause.

UAW-GM, 579 N.W.2d at 416.  Accordingly, "when the parties include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is not integrated."  Id. at 418.  The only exceptions are "in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete 'on its face' and, therefore, parol evidence is necessary for the 'filling of gaps.'"  Id.

This is not a case where fraud invalidates the integration clause.  Nor is the agreement obviously incomplete on its face.  Thus, parol evidence is not permissible in this context.

However, Whiteman's demand for reformation of the contract is based on the basic claim that the written contract did not reflect the intent of the parties at the time it was entered into.  According to Whiteman, the parties intended for the November 2007 Membership Purchase Agreement to discharge the promissory note that Whiteman signed in 2004 – but due to the parties' mistake or a drafting error, that is not reflected in the text of the 2007 Membership Purchase Agreement.[8]  Equitable principles counsel that Whiteman may present parol evidence in support of this claim.

It is well established in Michigan that courts have the power to reform contracts so that they accurately reflect the intent of the parties at the time the contract was entered.  See Casey v. Auto Owners Ins. Co., 729 N.W.2d 277, 284-85 (Mich. App. 2006) ("A court of equity has power to reform the contract to make it conform to the agreement actually made.") (citations and quotations omitted).  Courts are required to "proceed with the utmost caution in exercising jurisdiction to reform written instruments."  Olsen v. Porter, 539 N.W.2d 523, 525 (Mich. Ct. App. 1995).  Accordingly, "[t]he burden of proof is upon the party seeking reformation to

[8]By necessity, Whiteman's reformation claim is an alternative to Whiteman's counterclaim for declaratory judgment that the Membership Purchase Agreement does set out the understanding that his obligation under the Note is discharged by the agreement.  See D.E. 15 ("This Claim is brought in the alternative to Count I.")

present clear and convincing evidence that the contract should be reformed in order to carry out the true agreement of the parties."  See Chicago Title Ins. Co. v. East Arm, L.L.C., No. 242372, 2003 WL 22801883 at *5 (Mich. Ct. App. Nov. 25, 2003); see also Casey, 729 N.W.2d at 285.

Significantly, parol evidence can be considered in deciding whether reformation is appropriate under this standard.  This is a general principle of contract law.  See Joseph M. Perillo, Calamari and Perillo on Contracts § 9.31, at 375 (5th ed. 2003) ("[T]he parol evidence rule has no application in reformation cases."); Restatement (Second) of Contracts § 214(e) (1981) ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . ground for granting or denying rescission, reformation, specific performance, or other remedy.").  And, Michigan courts have applied this principle.  See, e.g., US Bank, N.A. v. Whittier, No. 293481, 2010 WL 4628692, at *7 (Mich. Ct. App. Nov. 16, 2010) (noting that "[r]eformation is proper if the parties agreed to accomplish a particular object by an executed instrument, but the instrument as executed failed to effectuate their intentions" and that "[f]or purposes of reformation, parol evidence can be used to determine whether a contract evidences a mistake"); see also Goldberg v. Cities Service Oil Co., 266 N.W. 321, 325 (Mich. 1936) ("Parol evidence is sufficient to warrant the reformation of a written instrument.") (citations and quotations omitted); Northpointe Bank v. Brotherton, No. 279035, 2008 WL 4181737, at *3 (Mich. Ct. App. Sept. 11, 2008) (in evaluating claim for reformation, "parol evidence was admissible not to vary the terms of the contract, but to show an alleged mutual mistake and the true intention of the parties.").

Finally, this is true even where, as here, the contract contains a merger clause.  See Joyce v. Joyce, No. 281175, 2009 WL 3929961, at *2 (Mich. Ct. App. Nov. 19, 2009) (relying on parol evidence in ordering the reformation of the contract to reflect the true bargain between the

parties, despite a merger clause); <u>City of Detroit v. TXU Energy Retail Co. L.P.</u>, No. 03-74279, 2005 WL 2319013 (E.D. Mich. Sept. 21, 2005) (same); <u>see also</u> 2 Dan B. Dobbs, Law of Remedies § 9.5, at 623 (2d ed. 1993) ("The mere fact that there is a writing that purports to integrate the entire agreement of the parties, does not prevent the plaintiff from showing that the writing is not in fact the one agreed upon and that it does not express the true contract.").

Turning, then, to the content of Whiteman's parol evidence, the question under the summary judgment standard is whether a genuine issue of material fact exists as to whether the parties intended that the 2007 Membership Purchase Agreement would discharge the 2004 Promissory Note.  There is evidence from which a fact finder could so conclude.  The evidence includes (i) the October 2007 email and spreadsheet in which Ameli-Tehrani explains that the calculations are based on the amount that Whiteman owed her from the note, (ii) the affidavit of Ferguson stating that Ameli-Tehrani and Whiteman asked him to draft the agreement to discharge the note, (iii) the affidavit of Schmidt, who had the same understanding, based upon the October 2007 email and other communications with the parties, and (iv) Ameli-Tehrani's later April 2009 email to Whiteman, referring to the earlier spreadsheet and its inclusion of Whiteman's debt in its calculations.  Although Ameli-Tehrani offers evidence of her own – in the form of an email she sent days after making the spreadsheet asking Whiteman when he would pay her back – on summary judgment this Court must not weigh the evidence and must instead view it in the light most favorable to Whiteman.  Accordingly, summary judgment is inappropriate.

In conclusion, Whiteman is entitled to consideration of his parol evidence by a fact finder.  Accordingly, Ameli-Tehrani is not entitled to summary judgment on her breach of contract claim.

14

### B.    Whiteman's Motion for Partial Summary Judgment

Whiteman argues that he is entitled to summary judgment on Count II (breach of fiduciary duty) and Count III (unjust enrichment) of Ameli-Tehrani's complaint.  He makes three arguments:  (i) that Ameli-Tehrani's breach-of-fiduciary-duty claim is barred by the three-year statute of limitations, (ii) that Ameli-Tehrani offered no evidence to support the fiduciary-duty claim, and (iii) that the unjust enrichment claim is barred because it is predicated on an implied agreement that was subsumed by an express agreement (i.e., the promissory note).  D.E. 59.

#### 1.  Breach of Fiduciary Duty

##### a.  Statute of Limitations

Under Michigan law, the limitations period for breach of fiduciary duty is three years. Mich. Comp. Laws § 600.5805(10); Moross Ltd. Partnership v. Fleckenstein Capital, Inc., 466 F.3d 508, 518 (6th Cir. 2006).  Ameli-Tehrani filed her complaint on October 20, 2009.  Thus, claims accruing before October 20, 2006 are presumptively time-barred.  See, e.g., Drake v. City of Detroit, 266 F. App'x 444, 448 (6th Cir. 2008) (unpublished).[9]

The  allegations  in the complaint specific to Ameli-Tehrani's breach-of-fiduciary-duty claim are:

> ¶ 26.    Whiteman has breached his fiduciary duties to Ameli-Tehrani by using her funds for his own purposes without her informed consent.

---

[9] The Court rejects Ameli-Tehrani's assertion that the statute of limitations for an action for breach of fiduciary duty does not begin to run until the fiduciary relationship ends.  See D.E. 70 (citing Carpenter v. Mumby, 273 N.W.2d 605 (Mich. Ct. App. 1978)).  Pursuant to Mich. Comp. Laws § 600.5827, the limitation period begins "from the time the claim accrues."  Here, the claim accrues "at the time the wrong upon which the claim is based was done regardless of the time when damage results."  Id.  The "time the wrong . . . was done" has been interpreted to be when all elements of the plaintiff's cause of action are present.  See Borock v. Comerica Bank-Detroit, 938 F. Supp. 428, 431 (E.D. Mich. 1996).  This, rather than the end of the fiduciary relationship, triggers the statute of limitations.  See Moross Ltd. Partnership v. Fleckenstein Capital, Inc., 466 F.3d 508, 518 (6th Cir. 2006) (statute of limitations for fiduciary-duty claim related to misrepresentations on a form triggered when form was filed with SEC, notwithstanding parties' ongoing fiduciary relationship).

¶ 27.   Whiteman has breached his fiduciary duties by misrepresenting his financial circumstances to Ameli-Tehrani.

¶ 28.   Whiteman has breached his duty of honesty, care and good faith by inducing Ameli-Tehrani to accept a promissory note based on false statements.

¶ 29.   To Ameli-Tehrani's knowledge, Defendant continues to misappropriate her money for his own use in connection with his business ventures in Idaho and elsewhere.

D.E. 1 ¶¶ 25-30.  Although Ameli-Tehrani does not specify the timing of her allegations, the record provides some assistance.  Because Ameli-Tehrani accepted the promissory note in 2004, her claim regarding Whiteman inducing her to accept the note (¶ 28) necessarily occurred sometime in 2004, and thus, beyond the statute of limitations.  Conversely, because Ameli-Tehrani's claims that Whiteman currently continues to misappropriate her money, that claim (¶ 29) is not time-barred (although Ameli-Tehrani would not be entitled to damages from misappropriation occurring before three years prior to the complaint).  Less clear are Ameli-Tehrani's allegations that Whiteman breached his fiduciary duties by "misrepresenting his financial circumstances to her" (¶ 27) and that he used "her funds for his own purposes without her informed consent" (¶ 26).  The temporal scope of these allegations is not clear.[10]

Accordingly, Whiteman's statute-of-limitations argument defeats the allegations of paragraph 28, but not the balance of Ameli-Tehrani's breach-of-fiduciary-duty claims.  The Court thus turns to Whiteman's second argument:  that Ameli-Tehrani has offered no evidence to

---

[10]  The misrepresentation-of-financial-circumstances allegation (¶ 27) may relate to the inducement-to-accept-promissory-note claim (¶ 28).  Ameli-Tehrani alleges elsewhere that Whiteman told her he could not pay the note because he was in dire financial straits and was about to foreclose on his home.  D.E. 1 ¶ 16.  If this is the activity to which the claim refers, it would be time-barred.  However, because the Court cannot draw this conclusion based on the current record, Whiteman has not sustained his burden of showing the allegations of paragraph 27 are time-barred.  See Biegas, 573 F.3d at 373 (burden on moving party to show that no genuine issue of material fact exists)

support her fiduciary-duty allegations.

### b.  Lack of Evidence to Support the Fiduciary-Duty Claim

The parties vigorously contest whether Whiteman and Ameli-Tehrani were in a fiduciary relationship.

In her complaint, Ameli-Tehrani alleges that Whiteman was her "business partner and legal advisor."  D.E. 1 ¶ 5.  As evidence in support of that claim, Ameli-Tehrani stated in her deposition that she relied upon Whiteman's "legal expertise" in conversations with him where "he led [her] to believe that [she] had unwittingly given up certain rights on [the promissory] note."  D.E. 62-2 at 11.  These conversations apparently occurred around the time Ameli-Tehrani emailed Whiteman asking for money in April 2009.  Id.  In addition, more recently, Ameli-Tehrani has also submitted an affidavit accompanying her response to Whiteman's motion for partial summary judgment.  The affidavit contains several additional assertions, potentially relevant to showing a fiduciary relationship between the parties, including that (i)  Whiteman was the trustee of Ameli-Tehrani's estate until November 2006, (ii) Whiteman and Ameli-Tehrani had two joint bank accounts until May 2007, (iii) the parties' business relationship as "50/50 members" of South University Properties lasted until at least November 2007, (iv) Ameli-Tehrani agreed to accept the promissory note in 2004 without consulting an attorney because she trusted Whiteman, (v) Ameli-Tehrani is not sophisticated in matters of business, (vi) Ameli-Tehrani prepared the 2007 spreadsheet "on [Whiteman's] express representation that the spreadsheet would not affect the debt," (vii) in 2009 Whiteman "advise[d] Ameli-Tehrani that she had waived her right to repayment under the Note," and (viii) Ameli-Tehrani "followed [Whiteman]'s directions in speaking with bankers, accountants[,] and lawyers right up until he told her that he no longer owed her anything under the Note."   D.E. 70 at 2-3 (response to

motion); D.E. 71 (Ameli-Tehrani affidavit).  Ameli-Tehrani also submitted exhibits supporting the first two claims.  D.E. 71-2 (Ameli-Tehrani will); D.E. 71-7 (joint bank accounts).

In response, Whiteman argues that any fiduciary relationship he and Ameli-Tehrani may have had would have been severed in 2004 because the parties became adverse when Ameli-Tehrani demanded payment and accepted the promissory note from Whiteman.  D.E. 73 at 5. Whiteman also argues that the Court should disregard the events related in the affidavit, pursuant to Federal Rule of Civil Procedure 37(c)(1), because Ameli-Tehrani failed to disclose them in a timely fashion in response to his discovery request.  Id. at 2.

For Ameli-Tehrani's fiduciary duty claim to survive summary judgment, she must establish a genuine issue of material fact concerning two elements:  (i) that the parties were in a fiduciary relationship and (ii) that the party having a fiduciary obligation breached it.  Because the Court concludes that there is a lack of evidence as to the second point, the Court need not definitively determine whether the parties were in a fiduciary relationship.

Even assuming that Whiteman did owe some sort of fiduciary duty to Ameli-Tehrani, there is no evidence of a breach of fiduciary duty during the relevant time period.  The complaint allegations of breach that are not conclusively time barred are that Whiteman (i) "us[ed Ameli-Tehrani's] funds for his own purposes without her informed consent," (ii) "misrepresent[ed] his financial circumstances to Ameli-Tehrani," and (iii) "continues to misappropriate her money for his own use in connection with his business ventures in Idaho and elsewhere."  D.E. 1.  With regard to the first, it is not clear to the Court what actions Whiteman allegedly took.  Regardless, the only evidence in the record that could fit the description of Whiteman using Ameli-Tehrani's funds without her consent is Ameli-Tehrani's affidavit statement that Whiteman wired money from their joint account to entities in Idaho for his own use.  D.E. 71 ¶ 9.  But the evidence

Ameli-Tehrani provides shows a transfer that occurred in August 2004, making this allegation time-barred.  D.E. 71-8 (8/30/04 wire transfer from joint account).  With regard to the second alleged misconduct, the complaint is again vague as to what actions Whiteman took in misrepresenting his financial circumstances to Ameli-Tehrani.  Regardless of what the specific actions were, Ameli-Tehrani does not explain how Whiteman's alleged misrepresentation of his financial circumstances harmed her or otherwise breached a fiduciary duty to her.  (In addition, if the allegation is related to inducing her to accept the promissory note, as explained above, this claim is time-barred.)  As to the third allegation – that Whiteman continues to misappropriate Ameli-Tehrani's money – Ameli-Tehrani has provided no legitimate evidence.  The records of the August 2004 wire transfers, even assuming they show misappropriation, are not evidence of continuing activity.  There are bank documents showing that Ameli-Tehrani and Whiteman had joint bank accounts until at least May 2007.  D.E. 71-7.  But they provide no evidence of misappropriation of funds by Whiteman.

In conclusion, on this record, there is no genuine issue of material fact as to Ameli-Tehrani's fiduciary duty claim.  Accordingly, Whiteman is entitled to summary judgment on Count II of Ameli-Tehrani's complaint.

## 2. Unjust Enrichment

Whiteman contends that he is entitled to summary judgment on Ameli-Tehrani's unjust enrichment claim.  His argument is as follows:  Under Michigan law, a contract will be implied pursuant to unjust enrichment only if there is no express contract addressing the same subject matter.  D.E. 59 at 9.  Ameli-Tehrani's unjust enrichment claim is that Whiteman did not pay back in 2004 the money she had given him for their joint business ventures, and that he has since been unjustly enriched by being able to retain those funds money and the benefits derived from

them.  D.E. 1 ¶ 32.  But Ameli-Tehrani accepted a promissory note for the money in 2004. According to Whitman, that express agreement (the promissory note) covers the same subject matter as Ameli-Tehrani's unjust enrichment claim.  And because Ameli-Tehrani has filed a breach of contract claim concerning the express agreement, under Michigan law, she is not permitted to also maintain an unjust enrichment claim.  For the reasons below, the Court rejects Whiteman's argument.

It is the case that "[i]n order to grant relief on the basis of unjust enrichment, the court must imply a contract between the parties" and that "'a contract will be implied only if there is no express contract covering the same subject matter.'"   Johnson Controls, Inc. v. Jay Indus., Inc., 459 F.3d 717, 731 (6th Cir. 2006) (citing Belle Isle Grill Corp. v. City of Detroit, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003).  However, in this case, contrary to Whiteman's argument, the express contract and the potential implied contract do not address the same subject matter.  The express contract (the breach-of-contract claim relating to the promissory note) involves damages of $550,000, plus interest.  See D.E. 1 ¶ 21.  The implied contract (the unjust enrichment claim) involves additional damages.  In addition to the $550,000 plus interest, Ameli-Tehrani requests "all other damages Ameli-Tehrani has suffered as a result of Defendant's breach of his duties to Plaintiff."  Id. at 4.  The unjust enrichment allegations of the complaint also refer to Whiteman having derived additional benefits from the use Ameli-Tehrani's funds. Id. ¶¶ 32, 34.  Such benefits are not expressly limited to the funds that are the subject of the promissory note.  Id.

At this stage, the Court cannot say, as a matter of law, that there is an express contract covering the same subject matter.   Accordingly, Whiteman is not entitled to summary judgment on Ameli-Tehrani's unjust enrichment claim.

**III.     Conclusion**

For the reasons explained above, Ameli-Tehrani's motion for summary judgment (D.E. 44) is denied.  Whiteman's motion for partial summary judgment (D.E. 59) is granted in part and denied in part.

s/Mark A. Goldsmith
MARK A. GOLDSMITH
United States District Judge

Dated:  May 13, 2011
          Flint, Michigan

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 13, 2011.

s/Deborah J. Goltz
DEBORAH J. GOLTZ
Case Manager
